IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:13-CV-527-F

| | |
|---|---|
| U.S. TOBACCO INC., ) | |
| U.S FLUE-CURED TOBACCO ) | |
| GROWERS, INC., and ) | |
| BIG SOUTH DISTRIBUTION, LLC, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | (UNDER SEAL) |
| BIG SOUTH WHOLESALE ) | |
| OF VIRGINIA, LLC, d/b/a BIG SKY ) | |
| INTERNATIONAL, BIG SOUTH ) | |
| WHOLESALE, LLC, UNIVERSAL ) | |
| SERVICES FIRST CONSULTING, ) | |
| a/k/a UNIVERSAL SERVICES ) | |
| CONSULTING GROUP, JASON ) | |
| CARPENTER, CHRISTOPHER SMALL, ) | |
| EMORY STEPHEN DANIEL, ) | |
| and other unnamed co-conspirators, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| Intervenor. ) | |

This matter is before the court on the Petition to Substitute [DE-448] filed by Defendants Big South Wholesale of Virginia, LLC, d/b/a/ Big Sky International, Big South Wholesale, LLC, Carpenter, and Small ("Defendants"). For the reasons that follow, the petition is ALLOWED in part and DENIED in part.

## I. BACKGROUND

Plaintiff U.S. Tobacco Cooperative, Inc. (USTC) is a cooperative of flue-cured tobacco growers which processes and markets its members' tobacco to domestic and international

customers.[1] Plaintiff U.S. Flue-Cured Tobacco Growers, Inc. (USFC) is a wholly owned subsidiary of USTC which manufactures cigarettes and other tobacco products.[2] The board members of USTC and USFC are identical.[3] Plaintiff Big South Distribution, LLC is a limited liability company whose sole member is USFC.[4] It was formed for the purpose of purchasing the assets of Big South Wholesale of Virginia, LLC ("Big South-Va.") and Big South Wholesale, LLC ("Big South Wholesale") and intended to be a wholesale distributor of tobacco products.[5] The managers of Big South Distribution are identical to the board members of USTC and USFC.[6] Defendants Big South-Va. and Big South Wholesale are limited liability companies whose sole members are Defendants Carpenter and Small.[7] Plaintiffs' claims arise from the sale of the assets of Big South-Va. and Big South Wholesale to Big South Distribution.

Plaintiffs allege Defendants Carpenter and Small artificially inflated the value of Big South-Va.'s and Big South Wholesale's inventory, thereby increasing the price Big South Distribution paid to acquire the companies' assets.[8] Plaintiffs further allege that, in violation of their non-compete and employment agreements, Defendants Carpenter and Small continued to sell tobacco products from Big South-Va. to Big South Distribution after the close of the Asset Purchase Agreement on May 1, 2011.[9] Plaintiffs also allege that Defendants paid "hush money" to Defendant Daniel, then Executive Vice President of USFC and President of Big South

---

[1] Second Am. Compl. [DE-214] ¶ 5.
[2] *Id.* ¶ 6.
[3] *Id.*
[4] *Id.* ¶ 7.
[5] *Id.*
[6] *Id.*
[7] *Id.* ¶ 8; Answer [DE-241] ¶ 8.
[8] Second Am. Compl. ¶¶ 53−56.
[9] *Id.* ¶¶ 59−64.

Distribution, in exchange for Defendant Daniel's help in perpetrating and concealing their wrongful activities.[10]

Defendants argue that, at all times relevant to this case, they were working on behalf of various government agencies (primarily the Bureau of Alcohol, Tobacco, Firearms and Explosives), entitling them to protection under the Westfall Act.[11]

## II. LEGAL STANDARD

The Westfall Act provides that the sole remedy "for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment" is against the United States. 28 U.S.C. § 2679 (b)(1). Where the Attorney General certifies that a defendant employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose," the United States is to be substituted as defendant. *Id.* § 2679(d)(2). "In the event that the Attorney General has refused to certify scope of office or employment . . ., the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment." *Id.* § 2679(d)(3). The defendant seeking Westfall certification bears the burden of proving by a preponderance of the evidence that he acted within the scope of his federal employment. *See Feldheim v. Turner*, 743 F. Supp. 2d 551, 556-57 (E.D. Va. 2010) (collecting cases).

## III. DISCUSSION

Defendants argue that their allegedly wrongful acts were committed on behalf of the United States government in furtherance of law enforcement operations, entitling them to Westfall certification. The United States opposes certification, arguing Defendants were not federal

---

[10] *Id.* ¶¶ 20−24, 31−33, 38−40, 89−91.
[11] *See* Pet. Substitute [DE-448] at 1.

employees. Plaintiffs also oppose certification, arguing that even if Defendants were federal employees, their allegedly wrongful conduct was outside the scope of their employment.

### 1. *Plaintiffs' claims for breach of contract are not subject to substitution.*

As an initial matter, Plaintiffs argue that Counts Twelve through Fourteen, alleging breach of contract, are not subject to substitution.

The Westfall Act does not allow for substitution in breach of contract claims. *See, e.g.*, *United Fed. Leasing, Inc. v. United States*, 33 F. App'x 672, 674 (4th Cir. 2002); *Blanchard v. St. Paul Fire & Marine Ins. Co.*, 341 F.2d 351, 357 (5th Cir. 1965) ("That claims based upon breach of contract are wholly alien to the Tort Claims Act is beyond question."). Nevertheless, Defendants urge the court to allow substitution on Plaintiffs' breach of contract claims, arguing that "the essence of those claims sounds in tort" and that Plaintiffs seek remedies traditionally associated with tort claims.[12]

Counts Twelve through Fourteen allege breaches of the APA, Defendant Carpenter's Consulting Agreement, and Defendant Small's Employment Agreement. Determination of these claims will necessarily depend on the terms of each contract. Accordingly, these are contract claims, not subject to substitution under the Westfall Act. With regard to the Plaintiffs' request for damages, monetary damages are a well-established remedy for breach of contract. *See, e.g.*, 24 Williston on Contracts § 64:1 (4th ed.) ("The primary if not the only remedy for injuries caused by the nonperformance of most contracts is an action for damages for the breach."); 11-55 Corbin on Contracts § 55.11 (2015) ("For breach of contract, the law of damages seeks to place the aggrieved party in the same economic position the aggrieved party would have attained if the contract had been performed."). That Plaintiffs seek damages flowing from their breach of

---

[12] Mem. Pet. Substitute [DE-449] at 25−26.

contract claims is unremarkable. The court now turns to the merits of substitution with regard to the remaining claims.

### 2. *Defendants were employees of the Government.*

An "employee of the government" includes, *inter alia*, "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671. Unlike government employees, independent contractors are not entitled to protection under the Westfall Act. *See Williams v. United States*, 50 F.3d 299, 305 (4th Cir. 1995) ("Given the distinction between independent contractors and agents or employees of the United States, resolving the issue of liability of the United States via Meridian hinges on Meridian's classification as an independent contractor or as an agent or employee of the United States." (quoting *Logue v. United States*, 412 U.S. 521, 528 (1973))). Whether a person is a government employee or an independent contractor is a question of federal law, and turns on the extent to which the government may exercise control over the purported employee's actions. *See id.* at 307; *Wood v. Standard Products Co.*, 671 F.2d 825, 829 (4th Cir. 1982) (citing *United States v. Orleans*, 425 U.S. 807, 814 (1976); *Logue*, 412 U.S. at 527). Specifically, a defendant will be deemed an employee of the government "only where the Government has the power under the contract to supervise a contractor's 'day-to-day operations' and 'to control the detailed physical performance of the contractor.'" *Wood*, 671 F.2d at 829.

Informants generally do not qualify as government employees. *See* Dep't of Justice Torts Branch Monograph, *Federal Agencies and Employees for Purposes of the Federal Tort Claims Act*, 1997 WL 33702248, at *15 (collecting cases). A defendant who is more than the mere "run-of-the-mill informant," however, may be deemed an employee under the Westfall Act in

appropriate circumstances.[13] *See, e.g.*, *Wang v. Horio*, 741 F. Supp. 1373, 1378 (N.D. Cal. 1989), aff'd in part, rev'd in part sub nom. *Wang v. United States*, 947 F.2d 1400 (9th Cir. 1991) (concluding that an independent business consultant was a federal employee when he gathered information about his clients' tax fraud and reported it to the Internal Revenue Service, noting that the consultant "was acting under the detailed control" of his handler, who gave him express orders, and that the informant "did only what he was asked or told to do"); *Leaf v. United States*, 661 F.2d 740, 741 (9th Cir. 1981) (noting district court's conclusion that a helicopter pilot who crashed a plaintiff's airplane while posing as a drug smuggler was a federal employee).[14]

Here, Defendants' law enforcement activities clearly exceeded those of the run-of-the-mill informant. Defendants' Government cooperation spanned approximately seven years and supported multiple federal agencies nationwide.[15] In fact, Defendants' ATF handler, Agent Tom Lesnak, testified that at one point Defendants were involved in investigations tied to every ATF field office in the country.[16] Defendants assisted international and domestic investigations into tobacco trafficking and other serious crimes.[17] Defendants' covert activities included not only purchasing and selling tobacco products on behalf of the Government, but also developing close relationships within the tobacco industry.[18] Defendants built trust with targets and potential targets over the course of multiple transactions and interactions.[19] In one instance, Defendants

---

[13] The parties do not identify any Fourth Circuit cases on point and the court is not aware of any. The court, therefore, seeks guidance in the decisions of other circuits.

[14] Plaintiffs direct the court's attention to several cases in which Westfall certification has been denied confidential informants and cooperating witnesses, while Defendants point out multiple examples of courts granting certification. Each side claims their cited cases are more factually similar to the instant controversy. The existence of numerous cases decided both in favor of and against certification merely illustrates the fact-dependent nature of the inquiry, however. Thus, rather than parsing the factual nuances of the parties' cited cases, the court will apply the legal standard to the specific facts of the case before it, with the understanding that a confidential informant or cooperating witness *may* be deemed a federal employee where the facts support it.

[15] Lesnak Depo. Tr. at 103:14, 110:12−16, 118:6−10, 123:22−23.

[16] *Id.* at 115:4−9.

[17] *Id.* at 115:21−116:20.

[18] Carpenter Depo. Tr. at 22:8−24:3.

[19] *Id.* at 26:16−24.

6

travelled internationally to meet with a particularly sensitive target at the behest of the Government.[20] It is clear that Defendants Carpenter and Small were not typical informants, making a few controlled buys or handing over information already in their possession. Rather, Defendants, for years, acted as *de facto* federal agents, conducting the type of undercover investigation and asset development normally the responsibility of an actual agent.

Defendants' undercover work was at the direction and supervision of their Government handlers. The Government dictated from whom Defendants bought tobacco products and to whom they sold.[21] The Government also set the prices for each transaction and determined into which bank account the proceeds would be deposited.[22] Further, although Defendants Carpenter and Small owned and managed the "management account" into which much of the proceeds were deposited, they did so with the understanding that the Government would perform an accounting at the conclusion of each investigation and determine whether, and in what amount, Defendants were entitled to payment.[23]

The Government argues Defendants cannot be considered federal employees because they "operated legitimate businesses that were not owned and operated by the Government."[24] The Government need not, however, own and operate the defendant employee's business in order for him to qualify as a federal employee. *See, e.g.*, *Wang*, 45 F.3d at 1362; *Leaf*, 661 F.2d at 741. The Government further claims that Defendant Carpenter's confidential informant agreement "makes clear that he is not an employee or agent of the Government for purposes of his activities."[25] Although Carpenter's agreement does indicate that he is not an employee, the terms of this agreement are not dispositive of the issue because an informant's acknowledgment

---

[20] Whittemore Depo. Tr. at 187:13−188:20.
[21] Carpenter Depo. Tr. at 30:10−31:5.
[22] *Id.* at 80:10−19, 113:18−114:7; Lesnak Depo. Tr. at 255:21−22, 273:3−24.
[23] Lesnak Depo. Tr. 289:6−291:1.
[24] Gov. Mem. Opp'n [DE-474] at 9−10.
[25] *Id.* at 9.

7

that he is not a government employee does not necessarily preclude Westfall certification. *See, e.g.*, *Wang*, 45 F.3d at 1364 (observing that informant, deemed to be a government employee, had been admonished prior to his work for the IRS that he "should not conduct any illegal activity on behalf of the Internal Revenue Service and that *[he was] not an employee of the Internal Revenue Service*" (emphasis in original)). Finally, the Government advances a public policy argument, claiming that conferring employee status on a confidential informant or cooperating witness would be an expansion of the definition of federal employee for purposes of the Westfall Act. As discussed above, however, courts have already found such informants or witnesses to be federal employees in appropriate circumstances. Thus, a finding in accord with those decisions would not expand the United States' waiver of sovereign immunity.

The court is convinced that Defendants' unusually extensive activities on behalf of multiple federal agencies elevate their status beyond the run-of-the-mill informant and that they were sufficiently controlled by their Government handlers to qualify as federal employees. Accordingly, the court now turns to whether Defendants' allegedly wrongful acts fell within the scope of their federal employment.

### 3. *Defendants acted within the scope of their employment.*

The court determines whether a government employee acted within the scope of his employment by referring to the law of the state in which the tort occurred. *Maron v. United States*, 126 F.3d 317, 323-24 (4th Cir. 1997). In North Carolina, an employee acts within the scope of his employment if his conduct is "a means or method of doing that which he [is] employed to do," even if the specific conduct at issue is "wrongful and unauthorized or even forbidden." *Wegner v. Delly-Land Delicatessen, Inc.*, 270 N.C. 62, 66-67, 153 S.E.2d 804, 807−08 (1967). An employee acts outside the scope of his employment, however, where he

"depart[s], however briefly, from his duties in order to accomplish a purpose of his own, which purpose was not incidental to the work he was employed to do." *Id.*

In *Wegner*, 270 N.C. at 68, 153 S.E.2d at 809, the North Carolina Supreme Court described the fine line separating acts within the scope of employment from acts outside it. In that case, the court determined a busboy who struck a customer was not acting within the scope of his employment because "his job was to collect and remove dishes, carry trays, and the like," and the assault "was not for the purpose of doing anything related to the duties of a bus boy." *Id.* The court observed that the situation would be different "if the glass which he 'slammed down' upon the table had shattered and injured the plaintiff, for there the employee would have been performing an act which he was employed to do and his negligent or improper method of doing it would have been the act of his employer in the contemplation of the law." *Id.* In *Medlin v. Bass*, 327 N.C. 587, 595, 398 S.E.2d 460, 464 (1990), the court held that a school principal's sexual assault of a student was outside the scope of his employment because the defendant's "duties as principal included counseling a chronically truant student, but sexually assaulting the student was unrelated to counseling or any other function explicitly or implicitly authorized by defendant [Franklin County Board of Education] and could not conceivably further any [Franklin County Board of Education] purpose." Thus, North Carolina case law is clear that an employee's conduct is within the scope of his employment only if the act is the means by which the employee accomplishes his work.

The employee's conduct need not, however, be specifically authorized by his employer. Indeed, "[e]mployers seldom, if ever, instruct or directly authorize their employees to wrongfully invade the personal or property rights of others." *W. v. F. W. Woolworth Co.*, 215 N.C. 211, 1 S.E.2d 546, 549 (1939). Nonetheless, the employer bears liability for his employee's conduct

when "the employee is undertaking to do that which he was employed to do and, in so doing, adopts a method which constitutes a tort and inflicts injury on another." *Id.* Thus, although a defendant must show that the allegedly wrongful act was a means of accomplishing the work he was hired to do, he need not prove his specific conduct was approved, authorized, or requested by his employer.

In this case, Plaintiffs allege three types of wrongful actions by Defendants. First, Plaintiffs claim Defendants misrepresented the cost of the inventory included in the APA, thereby inflating the amount Plaintiffs paid to acquire Defendants' assets.[26] Next, Plaintiffs claim Defendants Carpenter and Small, in violation of their employment agreements and the noncompetition agreement contained in the APA, continued to acquire products via Big South-Va. d/b/a Big Sky International and sell those products to Plaintiffs.[27] Finally, Plaintiffs allege Defendants paid Defendant Daniel "hush money" to secure his complicity with their fraud.[28]

The evidence demonstrates Defendants were acting within the scope of their federal employment during the commission of each of these allegedly wrongful acts. With regard to the inventory valuation, part of Big South-Va.'s inventory included tobacco products acquired in connection with ATF investigations.[29] The true cost of these products—and the amount reported to Plaintiffs—included not only the base purchase price, but also additional costs associated with their acquisition.[30] The amount to be added to the base purchase price, and therefore the total valuation reported to Plaintiffs, was dictated by Agent Lesnak.[31] Explaining the rationale behind these valuations, Defendant Small testified as follows:

---

[26] Second Am. Compl. [DE-214] ¶¶ 52−58.
[27] *Id.* ¶¶ 59−64.
[28] *Id.* ¶¶ 20−24, 31−33, 38−40, 89−91.
[29] Lesnak Depo. Tr. at 214:3−215:4.
[30] *Id.* at 216:4−18.
[31] *Id.*; Carpenter Depo. Tr. at 181:2−9.

10

> To buy the cigarettes – the cigarettes served a purpose. It wasn't just to buy cigarettes. Right? It was to support law enforcement. So the expenses that go along with that law enforcement, which is the whole reason that justified the sale of that product to us . . . it's all of the expenses that went into it that give you your cost. If I said I am going to sell you a car for $10 but I'm going to charge you $700 for the tires, are you getting the car for $10 or when you drive off, are you getting $710? It's the same analogy. We couldn't take the car without putting tires on it.[32]

Agent Lesnak also testified to his role in the inventory valuation, noting that the Government needed to "make sure we reconciled our inventory and that at the acquisition that the government-purchased inventory was paid back to the government."[33] When asked whether the price reported to Plaintiffs accurately reflected the cost of the product to Defendants, Lesnak responded "that's what the government was owed and that's what the government obviously got to make sure our inventory was zero."[34] The evidence shows that the products that are the subject of disputed valuations were acquired on behalf of the Government and the Government controlled the cost reported for those products. Given the deposition testimony, the court is persuaded that Defendants were acting in their capacity as federal employees when they reported the value of their inventory to Plaintiffs.

The court now turns to Defendants' acquisition and sale of tobacco products after May 1, 2011. Both before and after the close of the APA, Defendants were tasked by the Government with "buying, selling and trading with the targets" of the ATF's investigations.[35] According to Agent Lesnak, the tobacco products purchased on behalf of the ATF "had to move" for Defendants to accomplish the goals of the investigation.[36] Defendant Carpenter testified that, as had been the case prior to the APA, Defendants were instructed by Agent Lesnak to distribute

---

[32] Small Depo. Tr. at 182:6−21.
[33] Lesnak Depo. Tr. at 214:8−11.
[34] *Id.* at 215:8−17.
[35] Lesnak Depo. Tr. at 282:5−16.
[36] *Id.* at 248:20−25 ("That was the model. The product had to move. That was our mandate from main Justice. That was the undercover operation . . . . The only way to do that was to sell the product.").

11

some tobacco products to specific targets or undercover agents and to "sell the balance of the product to Big South Distribution or anyone else that we got authorization to sell the product to."[37] Agent Lesnak acknowledged that he was aware that Defendants would continue to sell products to Plaintiffs after May 1, 2011, and that such sales were part of the ATF's plan.[38] Further, with regard to those sales, Agent Lesnak continued to set the prices as he had done prior to the close of the APA.[39] Thus, the evidence shows that the Government was not only aware of Defendants' continuing sales of tobacco products to the Plaintiffs after the close of the APA, but that these sales were an integral part of ATF investigations.

Finally, with regard to Defendants' payments to Defendant Daniel, the court concludes Defendants were acting within the scope of their federal employment. Defendants Carpenter and Small testified that Agent Lesnak instructed them to pay Defendant Daniel for his cooperation with the Government.[40] Defendant Small categorized the payments to Defendant Daniel as examples of the "checks [Defendants Carpenter and Small wrote] on behalf of law enforcement, for law enforcement, and towards law enforcement."[41] With regard to specific payments, Defendant Small testified that at least one payment to Daniel, made the day after the closing of the APA in the amount of $69,066.67 was a "payment of deferred income . . . related to two cases that were yet to be adjudicated and hadn't been reconciled."[42] Addressing other post-APA payments, Defendant Small further testified that Agent Lesnak "was definitely involved in the decision to pay Mr. Daniel," and that these payments were in exchange for "services. He was

---

[37] Carpenter Depo. Tr. at 78:3−13.
[38] Lesnak Depo. Tr. at 208:13−209:16.
[39] *Id.* at 255:21−22.
[40] Carpenter Depo. Tr. at 129:18−130:17; *see also* Carpenter Decl., Aug. 24, 2016 Hr'g, Ex. D [DE-463-3] ¶ 21; Small Depo. Tr., Vol. II, at 286:13−15.
[41] *Id.* at 287:8−10.
[42] Small Depo. Tr., Vol. I, at 187:1−6.

12

helping the ATF and DEA, FDA, CBP."[43] Defendant Daniel also testified that the payments he received from Defendants Carpenter and Small were "from the government for the work [he] had done for them."[44] Although Agent Lesnak does not admit having given a specific instruction to pay Defendant Daniel, his account of the conversation with Defendants Carpenter and Small generally corroborates their testimony.[45]

Plaintiffs argue that Defendants' conduct exceeded the proper authority of the ATF, and therefore must have exceeded the scope of their employment. During the August 24, 2016 evidentiary hearing, and throughout their briefing on this issue, Plaintiffs have cast doubt on the propriety of the ATF's investigative techniques. Plaintiffs question whether the agency's use of a management account is authorized, whether the agency may use a private citizen to backstop its operations, and whether the agency has the authority to order large payments to its confidential informants and witnesses. These questions, while understandable, miss the point. Government agencies are imperfect. A Government employee might very well exceed the bounds of his agency's authority, and in doing so, commit a tort. If his conduct is a means of accomplishing the work he is assigned to do, however, the wronged party's recourse is with the Government. The court's conclusion here is neither an endorsement nor an indictment of Defendants' and the Government's actions in this case, the merits of which are not before the court at this time. The court simply concludes that the conduct Plaintiffs complain of appears, by a preponderance of the evidence, to have been undertaken in support of Defendants' work for the Government.

---

[43] Small Depo. Tr., Vol. II, at 286:8−9, 287:4−5; *see also* Carpenter Decl. [DE-463-3] ¶¶ 26−27.
[44] Daniel Depo. Tr., Vol. I, at 218:4−10; 223:24−224:5.
[45] Lesnak Depo. Tr. at 220:17−222:11 ("[Daniel] was around quite a bit and he had been busy on many other operation issues and I had mentioned to [Carpenter]—I said, is he being paid for this or some phrase like that. . . . And [Carpenter] said, quote, yeah, we got it taken care of.").

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Petition to Substitute [DE-448] is ALLOWED in part and DENIED in part. The United States of America is hereby substituted as defendant as to Plaintiffs' Fourth through Ninth and Seventeenth Claims for Relief.

SO ORDERED.

This the 7th day of November, 2016.

JAMES C. FOX  
Senior United States District Judge